STATE of Utah, Plaintiff and Appellee,

v.

Arden Brett BULLOCK, Defendant
and Appellant.

No. 870053.

Supreme Court of Utah.

Oct. 18, 1989.

Rehearing Denied Nov. 20, 1989.

Certiorari Denied June 28, 1990.

See —— U.S. ——, 110 S.Ct. 3270.

Craig S. Cook, Salt Lake City, for appellant.

David L. Wilkinson, David B. Thompson, Salt Lake City, for appellee.

HALL, Chief Justice:

Defendant appeals his convictions of three counts of aggravated sexual abuse of a child[1] and three counts of sodomy upon a child.[2] The issue presented is whether defendant was convicted on the basis of inadmissible evidence which deprived him of a fair trial. Defendant does not challenge the sufficiency of the evidence. Rather, he contends that the manner in which the case was investigated so tainted the evidence that it was rendered inadmissible at trial, that the trial court committed plain error in admitting the child victims' out-of-court statements and the opinions of the expert witnesses into evidence, and that trial counsel was ineffective in failing to raise the admissibility issue and in not seeking to suppress the evidence prior to trial. Thus, the relief sought on appeal is reversal of the trial court and dismissal of the charges.

One of defendant's former neighbors learned of her four-year-old son's purported involvement in sexual activity. This prompted her to seek an evaluation of her son by Dr. Barbara Snow, a social worker in the Intermountain Sexual Abuse Treatment Center. The child disclosed to Dr. Snow that defendant's son and another young male friend in the neighborhood had touched his penis and performed fellatio on him. Dr. Snow notified the Division of Family Services, which in turn referred the matter to the Bountiful Police Department. Dr. Snow interviewed one of the boys, who

1. In violation of Utah Code Ann. § 76–5–404.1 (Supp.1988) (amended 1989).

2. In violation of Utah Code Ann. § 76–5–403.1 (Supp.1987) (amended 1988).

acknowledged that he and defendant's son had abused the four-year-old in a manner they and two of their neighborhood friends had learned from defendant while playing a "game" with him at his home. Dr. Snow did not interview defendant's son, but in subsequent interviews of the other three boys, each related that defendant had touched their penises and performed fellatio on all four of them. Also, defendant had each of them touch his penis and perform fellatio on him. And defendant threatened to harm them, their families, or their pets if they told anyone about it. Dr. Snow also made this information available to the Bountiful Police Department.

The three boys were thereafter individually interviewed by Dr. Ann Tyler, a psychologist and the executive director of the Family Support Center, an organization devoted to the prevention and treatment of child abuse and neglect. The interviews conducted by Dr. Tyler produced disclosures of sexual abuse and threats by defendant similar to those disclosures made to Dr. Snow.

Following the Tyler interview, the county attorney held a meeting in his office attended by the three boys, their parents, two deputy county attorneys, and a member of the police department. At this meeting, two of the boys recounted the sexual abuse perpetrated by defendant, but the third denied that anything had happened to him.

Prior to trial, the testimony of the three boys was videotaped for use at trial.[3] Their testimony was presented to the court, and each party had the opportunity to examine the witnesses through counsel. Defendant viewed the proceedings from a location out of the presence of the witnesses. The testimony of each of the boys detailed the sexual abuse perpetrated by defendant and the threats he made against them if they should tell anyone about his acts. The boy who previously denied that the

abuse had occurred explained his denial by stating that he was no longer afraid of defendant's threats to him, his family, and his pet dog. At trial, the videotapes were received into evidence and were viewed by the jurors.[4]

Also at trial, Dr. Snow was questioned extensively regarding her credentials and interviewing techniques. She testified that she holds doctorate and masters degrees in social work and that she has had considerable training and experience concerning the area of child sexual abuse. Her employment is in the therapeutic field, and her interests are directed toward the healing of children instead of investigation for the purpose of criminal prosecution. She testified that the interviewing techniques she utilizes differ from those of the police, whose interests are directed toward proving the elements of a crime. Indeed, her "intervention with children is not from a neutral position," as she is "a child's advocate." She described herself as an ally of such children and explained that her "purpose in gathering information from them is to only gather that information that helps them heal." As such, she remains "relatively indifferent to what happens with the perpetrator." She testified that her concern is to determine the truth, and she relies upon specific criteria for assessing the truthfulness of a child's statements concerning sexual abuse.

Dr. Snow's interviews of the boys were not taped, with the exception of a videotaped session with one boy and an audiotaped session with another boy and his father. She acknowledged that videotaping a child's initial interview is recommended by some in the field of diagnosing and treating child sexual abuse. However, she noted that it was not her practice to record the sessions because, in her experience, the use of a tape recorder or video machine is disconcerting to children and inhibits their responses. Accordingly, her

---

**3.** Pursuant to Utah Code Ann. § 77–35–15.5 (Supp.1987) (amended 1988; repealed 1989); *see* Utah R.Crim.P. 15.5.

**4.** *Id.* The constitutionality of this procedure and the effect of the United States Supreme

Court's decision in *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), are issues not before us in this case. *See also infra* pages 159–160 & note 13 (discussion of trial strategy and invited error).

testimony at trial concerning her interviews of the boys was based primarily on memory.

At trial, Dr. Tyler was questioned extensively regarding her qualifications and the procedures she followed in conducting her interviews with the boys. She testified that she is a licensed psychologist with substantial training and experience in the field of child sexual abuse. As such, she performed individual "corroborative assessments" of the three boys and reached the conclusion that each had been sexually abused. Her training emphasized the importance of data collection and good record keeping, including the use of tapes.

In response, defendant presented three expert witnesses who were critical of Dr. Snow's techniques and the validity of Dr. Tyler's corroborative assessments because of the asserted contamination of the victims' testimony occasioned by Dr. Snow's interviewing process. Specifically, Dr. Monica Christy testified that it was important to tape the initial interviews of the children, not only to record the answers, but also to understand how the questions were asked and to be able to remember the fine details of the interview. Dr. Christy challenged the objectivity of Dr. Snow's interviewing techniques of ignoring the child's response until the child learned to give the answer she expected and of rewarding answers that she liked by making such comments as "good boy." Dr. Christy was critical of Dr. Snow's practice of "shaping" the testimony of a child by confronting an undesired response with the statement that the child must tell the truth, thereby implying that the truth had not been told. She was also critical of the fact that at the meeting held in the office of the county attorney, the boys were permitted to "cross-contaminate" each other by sharing their versions of the sexual abuse incidents.

Dr. Michael DeCaria was similarly critical of Dr. Snow's interviewing procedures. He testified that when interviewing children, the questions must be "open-ended." That is, a question cannot have the answer already contained within it. The interviewer must also be neutral and impartial from the outset and not make prejudgments as to what has occurred. Additionally, Dr. DeCaria explained that there is a danger in having children repeat allegations to different people since the more an event is discussed, the more real the event may seem to become. He emphasized the need to record the interviews of the children. It was his ultimate opinion that by the time the boys were interviewed by Dr. Tyler, they were irretrievably contaminated by their previous contacts with Dr. Snow, their parents, and the other children.

Dr. Stephen Golding testified that one who interviews a child in such cases must remain completely neutral and that when Dr. Snow conceded that she was a child advocate looking for sexual abuse, she missed the forensic mental health standards "by a mile." It was his conclusion that once the boys had been contaminated by the interviewing methods of Dr. Snow, it was impossible for Dr. Tyler or anyone else to know what had actually happened.

Defendant contends that he was denied due process because the initial interviews of the child victims conducted by Dr. Snow so contaminated the investigative process through suggestive questioning and inadequate recording practices that the evidence of sexual abuse that surfaced during her interviews and the subsequent interviews of the victims by other persons, including their parents, rendered all of the evidence inadmissible.

Defendant also claims that he was denied effective assistance of counsel because trial counsel (1) failed to raise the due process challenge to the admissibility of the State's evidence of child sexual abuse; (2) failed to challenge the admissibility of the child victims' out-of-court statements; (3) failed to object to the competency of the children, parents, and experts to testify; (4) failed to object to the "syndrome" evidence; (5) failed to object to the videotaping procedures employed; (6) failed to object to the expert witness testimony that the children in this case were victims of sexual abuse; and (7) failed to make an opening statement or file post-trial motions. Defendant

concedes that the claims raised on appeal were not raised in the court below.

It is apparent from the record that it was the strategy of defense counsel to attack the quality of the State's evidence in an effort to persuade the jury of the insufficiency of the evidence to support a conviction. Defense counsel did so by extensively cross-examining the State's witnesses and by presenting countervailing testimony of defense experts, evidence of defendant's good character and reputation for truthfulness, and defendant's own denial testimony.

The record also reflects that both the judge and counsel were well aware of the significant evidentiary issues which permeate a trial in this kind of case. At one of several pretrial conferences held to resolve procedural issues, the court reviewed with counsel the provisions of Utah Code Ann. § 76–5–411 (Supp.1985) (amended 1988 & 1989),[5] which governed the admissibility of out-of-court statements of child victims of sexual abuse. The court also reviewed with counsel the applicability of *State v. Nelson*,[6] a recent case wherein we interpreted the provisions of said section 76–5–411.

Trial counsel challenged the admissibility of only a modicum of the State's evidence. On the other hand, appellate counsel has attacked the admissibility of virtually all of the State's evidence. However, because trial counsel failed to object below, defendant is precluded by rule 103(a)(1) of the Utah Rules of Evidence from raising any of these points on appeal in the absence of showing that (1) the trial court committed plain error in admitting the evidence or (2) trial counsel was ineffective in failing to raise objections to the same.[7] In the con-

text of this case, we need not reach the issues pertaining to the propriety of the trial court's evidentiary rulings or defendant's claim of plain error.

██ In order for an erroneous ruling by a trial court to constitute reversible error, the error must have been harmful and we must be persuaded either that the ruling was properly objected to before the trial court or, if not objected to, that the ruling was plainly erroneous.[8] Defendant urges that the evidentiary rulings which he finds objectionable on appeal fall into the plainly erroneous category. However, we do not appraise all rulings objected to for the first time on appeal under the plain error doctrine. For example, if trial counsel's actions amounted to an active, as opposed to a passive, waiver of an objection, we may decline to consider the claim of plain error.[9] Such a course of action is consistent with the policy underlying the plain error rule. The plain error rule permits the appellate court to assure that justice is done, even if counsel fails to act to bring a harmfully erroneous ruling to the attention of the trial court. But if a party through counsel has made a conscious decision to refrain from objecting or has led the trial court into error, we will then decline to save that party from the error. This flexibility is inherent in the plain error rule. "[T]he plain error ... test ... ultimately permit[s] the appellate court to balance the need for procedural regularity with the demands of fairness."[10]

In the context of this case, before addressing defendant's claim of plain error, it is necessary to address the threshold issues: Was the failure to raise the objections before the trial court the result of a consciously chosen strategy of trial counsel

---

5. The amendments are not pertinent here.

6. 725 P.2d 1353 (Utah 1986).

7. Utah R.Evid. 103(d); *see State v. Verde*, 770 P.2d 116, 118–19 (Utah 1989) (ineffective assistance claim asserted to avoid effect of failure to object); *State v. Eldredge*, 773 P.2d 29, 35–36 (Utah 1989) (plain error explained), *cert. denied,* —— U.S. ——, 110 S.Ct. 62, 107 L.Ed.2d 29 (Oct. 2, 1989); *State v. Medina*, 738 P.2d 1021, 1023–24 (Utah 1987) (manifest error and ineffective

assistance claims asserted to avoid effect of failure to object).

8. *Verde*, 770 P.2d at 121.

9. *See, e.g., Medina,* 738 P.2d at 1023; *Morgan v. Quailbrook Condominium Co.,* 704 P.2d 573, 579 (Utah 1985); *A.I.D. v. Jewkes,* 701 P.2d 486, 487–89 (Utah 1984).

10. *Verde,* 770 P.2d at 122 n. 12 (citation omitted).

rather than an oversight, and if it was a strategic decision, did the making of that choice constitute ineffective assistance of counsel? If the decision was conscious and did not amount to ineffective assistance of counsel, this Court should refuse to consider the merits of the trial court's ruling. Indeed, the failure to object in such instances should be treated as a conscious waiver and should preclude further consideration of the issue. This was precisely the course that was followed in *State v. Medina*,[11] which was decided under the manifest injustice provision of rule 19(c) of the Utah Rules of Criminal Procedure. In circumstances such as those presented here, "manifest injustice" and "plain error" are operationally synonymous.[12]

The necessity for an appellate court's following such an approach is obvious when the consequences of the alternative are considered. If trial counsel were permitted to forego objecting to evidence as part of a trial strategy that counsel thinks will enhance the defendant's chances of acquittal and then, if that strategy fails, were permitted to claim on appeal that the Court should reverse because it was plain error for the court to admit the evidence, we would be sanctioning a procedure that fosters invited error.[13] Defendants are thus not entitled to both the benefit of not objecting at trial and the benefit of objecting on appeal.[14]

The plain error rule exists to permit review of trial court rulings as a way of protecting a defendant from the harm that can be caused by less-than-perfect counsel. But the purpose of that rule is in no way implicated if defense counsel consciously elects to permit evidence to be admitted as part of a defense strategy rather than through inadvertence or neglect.[15]

■ The State contends that the manifold failures to object complained of by appellate counsel for defendant were the

result of a conscious strategy, and we agree. It is reasonable to conclude that defense counsel, an experienced criminal lawyer, consciously chose not to seek the exclusion of the testimony about which defendant now complains. While the evidence complained of may have been inadmissible, trial counsel could reasonably conclude under these circumstances that there was little chance of keeping the testimony of the children out of evidence, especially after the trial court *sua sponte* made reliability findings. He might well have thought that the only way of effectively undermining the mutually consistent testimony of these young children about shocking incidents of sexual abuse was not to insist that the children testify at trial or object to their videotaped testimony, but rather was to put a less sympathetic adult witness, such as Dr. Snow, on the stand and to portray her as an unprofessional, misguided zealot who put these ideas in the children's minds through the use of techniques akin to brainwashing. In this way, counsel could explain to the jury why the children were relating untrue stories which they seemed to believe. Having made this decision, counsel could reasonably have concluded that it would be inconsistent to seek to exclude Dr. Tyler's testimony about behavior and the children's out-of-court statements and that since the experts, not the children, were thus "on trial," there was little reason to try to keep out their opinions on abuse.

In claiming ineffectiveness of counsel, defendant must bear the burden of demonstrating that trial counsel's representation fell below an objective standard of reasonable professional judgment and that counsel's performance was prejudicial.[16] Defendant has failed to meet this two-pronged standard on any of his claims of ineffectiveness of counsel.

Defendant must overcome the strong presumption that trial counsel rendered ad-

**11.** 738 P.2d 1021, 1023.

**12.** *See Verde,* 770 P.2d at 121–22.

**13.** *See State v. Tillman,* 750 P.2d 546, 560–61 (Utah 1987).

**14.** *See Medina,* 738 P.2d at 1023.

**15.** *Id.*

**16.** *State v. Carter,* 776 P.2d 886, 893 (Utah 1989).

equate assistance and exercised reasonable professional judgment.[17] Whenever there is a legitimate exercise of professional judgment in the choice of trial strategy, the fact that it did not produce the expected result does not constitute ineffectiveness of counsel.[18]

As heretofore observed, it is apparent from the record that it was the strategy of defense counsel to attack the quality of the State's evidence in an effort to persuade the jury of the insufficiency of the evidence to support a conviction. Counsel for the defense effectuated this by cross-examining the State's witnesses and by presenting countervailing testimony of defense experts, evidence of defendant's good character and reputation for truthfulness, and defendant's own denial testimony.

Furthermore, review of the record confirms that defense counsel effectively put Dr. Snow "on trial" and mounted an effective attack on her motives and methods through both her testimony and that of other experts. Nevertheless, the jurors were apparently persuaded that the children spoke the truth. However, the actions of defense counsel, when considered in light of the presumption of competence that attends any representation, lead to the conclusion that counsel was not ineffective and that the failure to object to the errors alleged by appellate counsel was the result of conscious trial strategy. Hence, we do not reach defendant's plain error contentions.

The decisions of defense counsel not to offer an opening statement and not to make post-trial motions are well recognized as matters best left to the professional judgment of counsel. Defendant has not demonstrated that his representation by defense counsel fell below an objective standard of reasonable professional judgment,[19] nor has he shown that he was prejudiced by counsel's decision not to offer an opening statement or make post-trial motions.[20]

The conviction and judgment are affirmed.

BILLINGS, Court of Appeals Judge, concurs.

ZIMMERMAN, Justice: (concurring).

I fully concur in the Chief Justice's opinion. My concurrence with the majority, however, should not be read as a rejection of all the points made so forcefully by Justice Stewart in his dissent. In some particulars, I agree with his assessment of the admissibility of the evidence. However, I cannot agree that any of this warrants our reaching the merits.

Trial counsel consciously chose a strategy that differs from that which appellate counsel thinks might have succeeded below and which Justice Stewart states would have resulted in the exclusion of virtually all of the State's evidence. However, there is certainly no assurance that the trial court, or a majority of this Court, would accept the proposition advanced by appellate counsel and by Justice Stewart that the children were so tainted by Barbara Snow's activities that they could never take the stand. Absent the acceptance of that proposition, one cannot say that trial counsel's trial strategy was wrong, much less that it was incompetent. If trial counsel had chosen a different strategy and had succeeded in excluding the testimony of Barbara Snow and the videotapes of the children, he would still have faced the live testimony of several of the children. It is difficult to conclude that, tactically speaking, having the children testify live in the absence of Snow would have been better for the defense than having the children appear by videotape and focusing the whole trial on Snow and the manner in which the State's case was prepared.

---

**17.** *See Strickland v. Washington,* 466 U.S. 668, 689–91, 104 S.Ct. 2052, 2065–66, 80 L.Ed.2d 674 (1984); *State v. Lairby,* 699 P.2d 1187, 1203–06 (Utah 1984), *overruled on other grounds, State v. Ossana,* 739 P.2d 628, 631 (Utah 1987).

**18.** *Medina,* 738 P.2d at 1023–24.

**19.** *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064.

**20.** *Carter,* 776 P.2d at 893; *State v. Archuleta,* 747 P.2d 1019, 1023–24 (Utah 1987); *Codianna v. Morris,* 660 P.2d 1101, 1109 (Utah 1983).

The very subtlety and complexity of such judgments argue strongly for not considering the merits of challenges to conscious steps taken to implement them. For this reason, we should adhere to the principle that underlies the ineffective assistance of counsel standard of *Strickland* and the invited error exception to the plain error and manifest injustice rules—parties must generally abide by conscious choices they and their counsel make during trial. Justice Stewart has not shown why that principle does not apply here.

STEWART, Justice: (dissenting).

I dissent. The defendant was tried and convicted on an avalanche of hearsay. Not once was he ever allowed to confront his primary accusers face to face, nor was he able to cross-examine them at trial because their testimony was presented by videotapes made two months before trial. The accusations were also presented at trial through the testimony of a social worker and a psychologist who repeatedly interrogated the four young complainants and then acted as conduits for the admission of more of the boys' hearsay evidence.

The majority refuses to address any of the contentions raised by the defendant on this appeal on the ground that they were all waived by a "conscious decision" of defense counsel. However, it is flatly inaccurate to say that there was a "conscious decision" to waive the denial of face-to-face confrontation (*see* part III *infra*). The defendant undeniably did object—twice—to his exclusion from the videotaping of the testimony of the four complainants, and that issue is sufficiently raised on appeal to require resolution by this Court. These and other constitutional errors committed were so pervasive in their effect as to compel the conclusion that the trial did not meet minimum standards of fairness under the due process clauses of the United States and Utah Constitutions.

The majority states:

The State contends that the manifold failures to object complained of by appellate counsel for defendant were the result of a conscious strategy, and we agree. It is reasonable to conclude that defense counsel, an experienced criminal lawyer, consciously chose not to seek the exclusion of the testimony about which defendant now complains. While the evidence complained of may have been inadmissible, trial counsel could reasonably conclude under the circumstances, that there was little chance of keeping the testimony of the children out of evidence, especially after the trial court *sua sponte* made reliability findings. He might well have thought that the only way of effectively undermining the mutually consistent testimony of these young children about shocking incidents of sexual abuse was not to insist that the children testify at trial or to object to their videotaped testimony, but rather was to put a less sympathetic adult witness, such as Dr. Snow, on the stand and to portray her as an unprofessional, misguided zealot who put these ideas in the children's minds through the use of techniques akin to brainwashing. In this way, counsel could explain to the jury why the children were relating untrue stories which they seemed to believe. Having made this decision, counsel could reasonably have concluded that it would be inconsistent to seek to exclude Dr. Tyler's testimony about behavior and the children's out-of-court statements and that since the experts, not the children, were thus "on trial," there was little reason to try to keep out their opinions on abuse.

The record does not support the majority's blatant *speculation* that the "manifold failures to object" were the "result of a conscious strategy." It stretches credulity beyond the breaking point to argue, as the majority does, that it is "reasonable to conclude that defense counsel, an experienced criminal lawyer, consciously chose not to seek the exclusion of the testimony about which defendant now complains." In fact, the precise opposite is true. Competent trial counsel would have made proper objections *and* attacked the experts' testimony; there was no rational excuse for not objecting to the hearsay.

In any event, this is a classically appropriate case for application of the manifest error doctrine. Indeed, this is a compelling case for invoking that doctrine precisely because the majority itself recognizes that what is at stake here is whether the techniques that were used in the interrogation of the child accusers and preparation of their testimony for trial had the effect of "brainwashing" the boys. The majority does not even address that point; but if it has merit, as I believe it has, then this trial was in fact fatally infected with fundamental unfairness and cannot stand constitutionally. *See generally Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); *Malinski v. New York*, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945); *Chambers v. Florida*, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940). *See also Hurst v. Cook*, 777 P.2d 1029 (Utah 1989); *Chess v. Smith*, 617 P.2d 341 (Utah 1980).

Moreover, the validity of the techniques used by the social worker in this case in eliciting and shaping children's testimony is squarely put at issue and ought to be resolved because she has testified in numerous other child sex abuse cases. Since her techniques are so highly unreliable and may have induced false testimony, this Court should declare such techniques inappropriate and testimony elicited by them inadmissible before any other child sex abuse cases are tainted. Once testimony is tainted, it is unlikely that the taint can be excised, and convictions may have to be reversed that would not have to be if the testimony were not tainted. In the end, the cause of protecting children from sexually exploitive conduct is seriously set back by the majority's flat refusal to deal with this case on the merits.

I am aware that child sex abuse crimes are heinous. They often leave lifetime scars that may even damage subsequent generations. But in the natural rush to protect children from abuse, it is essential that judicial procedures designed to sift truth from error not be compromised or perverted. Those procedures are not mere "technicalities" which subvert justice; they are absolutely essential to achieve justice and must not be abandoned when they become difficult or inconvenient to apply. A legitimate public concern for the problems of child sex abuse must not be converted into a hysteria that overruns and tramples the rights of those who are accused. The Salem witch trials are not just an artifact of another era and another century; they say something about human nature that may well have been repeated in the notorious Scott County sex abuse case in Minnesota and the infamous McMartin Preschool case in Manhattan Beach, California, where numerous sordid reports of child sex abuse turned out to be false.[1]

1. The McMartin Preschool case, which, at the time of this opinion, is still in the trial stage, bears a resemblance in some respects to this case. An article in the popular press noted:
> What's not commonly known is that with the exception of one child, all of the former preschoolers denied being molested at school until *after* they were interviewed [by the social workers].... That child who made a claim was dropped from the case because her allegations were considered too bizarre.
> ... "What we had here were social workers questioning the children and asking very leading and suggestive questions," said District Attorney Ira Reiner.... "The children were rewarded with praise when they said something had happened."

> ... [T]here was nothing ... to back up the tales coming [from the social workers]. "One

of the things that struck me was the total lack of corroboration," Reiner said.... "The entire case was turned over to a group of social workers to handle. Their interviews were used as the only criminal investigation of this case."

Fischer, *McMartin, A Case of Dominoes?*, Los Angeles, October 1989, at 126, 131, 133 (emphasis in original). Charges against five of the seven McMartin defendants were dismissed before trial because the evidence was "incredibly weak." *Id.* at 133.

The point is of particular significance in view of some evidence of a high incidence of false reporting of child sexual abuse in cases involving divorce, custody, and visitation issues. Recent studies indicate that false reporting may range from 55 percent of cases alleging sexual abuse when child custody or visitation rights are in dispute to 8 percent in other cases.[2] One reason for inaccurate reporting has been attributed by scientific investigators to the use of improper methods of interrogating children.[3]

2. Raskin & Yuille, *Problems in Evaluating Interviews of Children in Sexual Abuse Cases,* in *Perspectives on Children's Testimony* 184, 185 (S. Ceci, D. Ross, M. Toglia, eds. 1989) [hereinafter Raskin & Yuille]. In fact, one reporter has indicated that many of the "unsubstantiated" cases may proceed to formal charges. *Id.* at 186.

3. Raskin & Yuille state:

A major cause of the problem is that case workers receive little training in conducting an investigative interview of children designed to gather information and assess the validity of accusations. It has become common practice for interviewers to assume that the allegations are true, and the purpose of the assessment is to obtain information that can be used to arrive at that conclusion. A typical case-worker attitude was expressed in a recent book on sexual abuse of children. [The author] stated that "Very young children do not make up complex lies.... It is certainly true that children fantasize, but they do not fantasize about sexual relationships with adults."

A social worker [Faller] recently wrote "we know that children do not make up stories asserting they have been sexually molested. It is not in their interests to do so. Young children do not have the sexual knowledge necessary to fabricate an allegation. Clinicians and researchers in the field of sexual abuse are in agreement that false allegations by children are extremely rare." Faller then proceeded to describe "strategies for corroborating the child's story." These included the use of statements to significant others, play, pictures, stories, anatomically explicit dolls, as well as assessment of the child's sexual knowledge, the sexual behavior of the child, and other behavioral indicators. This social worker concluded by stating that "the more supportive data the evaluator has, the more convinced he/she will be, and the more persuasive the evaluator's reported [sic] will be to others."

The foregoing represents a common approach to the assessment of allegations of sexual abuse of children. Many social workers, psychiatrists, and psychologists assume that certain behaviors of the child are definite indicators that abuse has occurred. *Their goal is to provide an atmosphere of support and encouragement to assist the child in describing the abuse the therapist is certain has occurred. Almost anything the child says and does is interpreted as being consistent with the trauma associated with sexual abuse, includ-*ing repeated and strong recantations by the child. Building on that general premise, interviews are conducted in a therapeutic and suggestive manner instead of with an investigative and questioning approach. After one or more sessions with the child, the therapist almost always concludes that the allegations or suspicions are true.*

Recent cases have underscored the problems that may result from poor techniques combined with zealous attempts on the part of case workers to prove that the allegations are correct. Those approaches produced considerable social and personal damage in Scott County, Minnesota, and Manhattan Beach, California. "In the Scott County cases, something clearly went awry." Cases were finally dismissed against twenty-one persons accused of child sexual abuse, even while investigations were in progress concerning allegations of homicides and sexual abuse made by some of the alleged child victims. The resulting extensive investigations by the FBI and the State of Minnesota concluded that there was no credible evidence of murders or justification for filing further charges of sexual abuse. Those allegations had been made by the children to their therapists.

The Scott County allegations arose after confirmed incidents of sexual abuse had occurred. However, problems of validity resulted from "repeated questioning, a lack of reports, and cross-germination of allegations." The child witnesses do not always appear to have been rehearsed, and testimony based on such procedures might cause investigators, prosecutors, and jurors to make errors of uncritically accepting the children's statements. A therapist reported that one child had already been interviewed by nine individuals, and a mother of another child indicated that her child had been interviewed between thirty and fifty times. Furthermore, interviews were frequently undocumented in any form, and there were instances of children being informed of what had been said by other witnesses and then being asked to report on abuse they had seen performed by those accused by the other witnesses. Children were interviewed together, housed in the same motels, given their meals together, and allowed to interact frequently. Parents were sometimes arrested and charged with abuse of their own children even though their children repeatedly denied the allegations over several weeks of interrogation after separation from their parents. The report concluded that "in-

The defendant was convicted of three counts of aggravated sexual abuse of a child, one against Steve, one against Bill, and one against his own son, Jerry. (For purposes of this opinion, the children have been assigned fictitious names.) The defendant was also found guilty of three counts of sodomy on a child, one involving Steve, one involving Bill, and one involving Richard. He was found not guilty of aggravated sexual abuse of his daughter, Susan, not guilty of sodomy on a child involving his son, Jerry, and not guilty of sodomy on a child involving Tom.

The evidence against the defendant on each count consisted entirely of hearsay. The testimony of the four accusers, Richard, Bill, Tom, and Steve, was presented by videotapes which were made two months prior to trial and played on a television monitor at trial, but the boys did not confront the defendant face to face, either at the videotaping or at trial. As shown below, all this was done in violation of the long-established principles guaranteed by the confrontation clauses of the Utah and United States Constitutions. In addition, much of the complainants' evidence against the defendant was seriously tainted by the "child advocate" who was instrumental in shaping, and even creating, portions of the boys' testimony. She was allowed to testify as an "expert" witness and to state conclusions not allowed under our recent ruling in *State v. Rimmasch*, 775 P.2d 388 (Utah 1989). Based solely on her interviews with the boys, she testified both that the boys had been abused and that they were telling the truth.

## I. MANIFEST ERROR

Manifest error exists when the error is plain and made to appear "on the face of the record and to the manifest prejudice of the accused...." *State v. Cobo*, 90 Utah 89, 102, 60 P.2d 952, 958 (1936). *See also State v. Eldredge*, 773 P.2d 29, 35 n. 8 (Utah 1989); *State v. Lesley*, 672 P.2d 79, 81–82 (Utah 1983); *State v. Wood*, 648 P.2d 71, 77 (Utah), *cert. denied*, 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982); *State v. Poe*, 21 Utah 2d 113, 118, 441 P.2d 512, 515 (1968); *State v. Stenback*, 78 Utah 350, 365, 2 P.2d 1050, 1056 (1931).

The purpose of the manifest error doctrine is to assure that a defendant is not convicted even though technical procedural requirements were not complied with in raising an error either in the trial court or in the appellate court. Neither a counsel's nor a judge's error should be the cause of one's going to prison. Although we often refuse to entertain a claim of error because an attorney failed to make proper objections in the trial court or failed to raise an error on appeal, the law should seek to make a party liable for his own transgressions, not for the sins of his lawyer.

This is a particularly compelling case for applying the plain or manifest error doctrine. In *State v. Eldredge*, 773 P.2d 29, 35 (Utah 1989), this Court indicated that it

vestigators, prosecutors, human service workers and therapists must all examine how they presently handle these cases in light of the Scott County experience."

The high incidence of sexual abuse of children combined with the growing number of unsubstantiated and fictitious reports are compelling arguments for minimizing the number of interviews of suspected child victims by using carefully structured interviews as early as possible in the investigative process. Interviews should be conducted by trained and skilled professionals who understand that their role is to obtain maximally reliable information to draw a conclusion concerning the validity of the allegations. Any therapy deemed necessary should be undertaken only after the investigation with the child has been substantially completed. Therapy should be conducted by a different pro-fessional, whose role is to treat the problems in the context of the incident, whether or not the allegations turn out to be true.

All interviews of the child should be based on a thorough acquaintance with the facts surrounding the allegations or suspicions, and they should be videotaped. A videotape is the only means whereby the procedures and data obtained during the interview can be fully documented. A typed transcript of the session is necessary for the systematic analysis of the content that is required to arrive at a conclusion regarding the validity of the statement the child gives. The videotape is made for the purposes of documentation and analysis by experts, and it should not be used as a substitute for live testimony by the child witness.

Raskin & Yuille at 186–88 (citations omitted, emphasis added).

would not be reluctant to reverse a child abuse conviction where there is plain error and the circumstances warrant such a reversal. Indeed, this Court's statements in *Eldredge* require application of the plain error rule here: [4]

> Other circumstances, however, might require a finding of plain error. For example, in a case in which a child declarant had, when first confronted with allegations of abuse, repeatedly denied that the abuse had taken place but admitted it under repetitious and coercive questioning, the potential unreliability of such hearsay and its consequent likelihood of causing unfair prejudice should be apparent to a trial court. Similarly, if a therapist testified to a child's hearsay statements regarding instances of abuse that were made during therapy sessions of which no records were kept, the unreliability of such testimony might also be plain.

773 P.2d at 36 n. 10. That paragraph describes the facts of this case almost precisely, yet inexplicably the majority plainly ignores it.

I turn next to the merits of this case.

## II. CHILD HEARSAY EVIDENCE; RELIABILITY

The hearsay rule is the key procedural device for implementing the right of confrontation and the values it safeguards. It is an absolutely essential part of the truth-sifting procedures of the judicial process.

Historically, children's testimony has been viewed skeptically because it presents special problems of reliability. Traditionally, the issue of the reliability of child witness testimony was dealt with as a matter of law by judicial evaluation of the competency of the witness to testify. In more recent times, the Federal Rules of Evidence and the Utah Rules of Evidence have abandoned the competency approach, relying instead on cross-examination and the faith that the trier of fact can evaluate children's testimony sufficiently to offset the risks it presents.

Because of greatly intensified concerns about the prevalence of child sex abuse and because of difficulties in obtaining evidence for the prosecution of some types of cases, the Legislature enacted Utah Code Ann. § 76-5-411 (Supp.1989) to make it easier for children to testify in the prosecution of such cases. That section currently provides in part:

> (1) Notwithstanding any rule of evidence, a child victim's out-of-court statement regarding sexual abuse of that child is admissible as evidence though it does not qualify under an existing hearsay exception, if:
>
> (a) the child is available to testify in court or as provided by Subsection 77–35-15.5(2) or (3);
>
> (b) in the event the child is not available to testify in court or as provided by Subsection 77–35-15.5(2) or (3), there is other corroborative evidence of the abuse; or
>
> (c) the statement qualifies for admission under Subsection 77–35-15.5(1).
>
> (2) *Prior to admission of any statement into evidence under this section, the judge shall determine whether the interest of justice will best be served by admission of that statement. In mak-*

---

4. In *State v. Eldredge,* the defendant was accused of sexual abuse of his son while in the midst of a custody dispute. 773 P.2d at 30. The reliability problems in this case are far worse than those in *Eldredge.* There, physical evidence corroborated the child's testimony, the child testified at the trial, as did his mother and the expert, and there were no objections to the procedures and interviewing techniques of the experts. In this case, by contrast, much evidence was presented that the expert witness, Barbara Snow, used highly suspect interviewing techniques and suggestive questions, positive and negative reinforcement, and other manipulative techniques that influenced the children's testimony during the interviews. *See infra* note 5. In addition, Dr. Snow, the alleged victims, their parents, and the police met together and collaborated regarding the alleged instances of abuse. Parents also urged their children to testify in a certain fashion, there was evidence of improper or no recordation of the content of Dr. Snow's interviews, and the alleged victims initially denied the allegations when confronted by their parents or Dr. Snow. All that cries out for application of the plain error or manifest error doctrine.

*ing this determination the judge shall consider the age and maturity of the child, the nature and duration of the abuse, the relationship of the child to the offender, and the reliability of the assertion and of the child.*

(3) A statement admitted under this section shall be made available to the adverse party sufficiently in advance of the trial or proceeding, to provide him with an opportunity to prepare to meet it.

(Emphasis added.)

This provision assures that children cannot be found incompetent as witnesses in child sex abuse cases simply because they are children, and it also provides that child hearsay statements in such cases are admissible (1) if they are reliable *and* (2) *if the child is available to testify at trial or there is corroborative evidence.* The determination required by subsection 2 is critical to meet constitutional requirements under the confrontation clauses of the state and federal constitutions. That subsection requires a trial judge to find that the interest of justice will be best served by the admission of the statement. In making that determination, the judge must consider, among other factors, the "nature and duration of the abuse, the relationship of the child to the offender, and the reliability of the assertion" and of the child. Thus, reliability must be shown (1) as to the actual hearsay statement made by a child and (2) as to the child declarant in general. In short, § 76–5–411 requires the courts to examine closely and to evaluate carefully the need for and reliability of child hearsay evidence before it can be admitted. The same is mandated by the confrontation clauses, which allow hearsay evidence to be admitted only if it is found to be reliable. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

Section 76–5–411 requires findings regarding reliability. Here, the trial court simply failed to make the determinations the statute requires with respect to the facts of this case. The trial court's findings do not begin to come to grips with the

psychologically coercive methods which were used by Dr. Snow and others in interrogating the four boys.

Under statutes similar to Utah's, appellate courts have held children's testimony to be unreliable and inadmissible as a matter of law when there was a likelihood that a child's testimony had been shaped or otherwise tainted by pressure or other improper methods used by parents or other persons in positions of authority. Adults may influence or shape a child's testimony and even the child's memory by the power of suggestion and other subtle means. In *State v. Ryan*, 103 Wash.2d 165, 691 P.2d 197 (1984), the Washington Supreme Court held that the testimony of two young boys was unreliable and inadmissible as a matter of law because, among other things, the boys' mothers had been told, before the mothers questioned the boys, that there was a strong likelihood that the accused had sexually abused them. The court stated that the mothers "were arguably predisposed to confirm what they had been told." 103 Wash.2d at 176, 691 P.2d at 205. *Cf. State v. Cooley*, 48 Wash.App. 286, 294–95, 738 P.2d 705, 709 (1987). Although *State v. Ramirez*, 46 Wash.App. 223, 231, 730 P.2d 98, 103 (1986), held child hearsay testimony admissible, it focused on the objectivity of the interview with the child as a determinant of reliability. In that case, since the child's mother had no prior suspicion and no predisposition to find abuse, her testimony as to the child's statement was found to be reliable. *See also State v. Superior Court, Pima County*, 149 Ariz. 397, 403, 719 P.2d 283, 290 (Ct.App.1986) (case remanded for hearing on reliability of child's statements because mother's marriage to the defendant was troubled and she was not an objective observer). *See* Boat & Everson, *Interviewing Young Children with Anatomical Dolls*, LXVII Child Welfare 337, 340 (1988); Christiansen, *The Testimony of Child Witnesses: Fact, Fantasy, and the Influence of Pretrial Interviews*, 62 Wash.L.Rev. 705, 711 (1987) [hereinafter Christiansen, *Testimony of Child Witnesses*].

These cases are in accord with other cases where the reliability of testimony is

seriously compromised. Thus, the courts have long excluded coerced confessions as a matter of law because they are too likely to be unreliable and because the courts have been reluctant to encourage conduct that is fundamentally at odds with a civilized system of justice. *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); *Chambers v. Florida,* 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940). Even when coercion is not used, testimony may be inadmissible as a matter of law because the means used to elicit it raises serious questions as to its reliability. For example, hypnotically induced or enhanced testimony is inadmissible in this and many other states. *State v. Tuttle,* 780 P.2d 1203 (1989), *petition for rehearing pending.* *See also State v. Mitchell,* 779 P.2d 1116 (1989). This rule governs even though the declarant is in court and subject to cross-examination.

Recently in *State v. Lenaburg,* 781 P.2d 432 (1989), this Court reversed a conviction on the basis that several factors combined to "raise serious doubts ... as to the reliability of the child's [videotaped] statements." 781 P.2d at 434. The child's statements simply were unreliable, and because the statements were not subject to cross-examination, reversal was required.

In this case, there is massive evidence of shaping and tainting testimony, as shown below. Beyond that, the four boys were not subject to cross-examination at trial. As discussed in Part III of this opinion, whatever cross-examination there was occurred at the videotaping of the boys' testimony two months prior to trial. At best, that cross-examination was perfunctory and ineffective, since at that time the defendant did not have the benefit of Dr. Anne Tyler's testimony concerning the boys' testimony and the interviews conducted by Dr. Snow or the testimony of other psychologists. All that was plainly essential for conducting an effective cross-examination of the boys. In short, there was *no* effective cross-examination of the boys' stories at all, whether presented by videotape or through the testimony of Drs. Snow and Tyler. Furthermore, there was no cross-examination of the boys at trial at all.

Dr. Snow's and Dr. Tyler's transmission into evidence of the boys' hearsay statements cannot be justified on the general principle that experts may base an opinion on hearsay evidence. Although that is true, experts cannot be used at trial simply as conduits for carrying torrents of hearsay statements into evidence which bear directly on the adjudicative facts at issue. *Edwards v. Didericksen,* 597 P.2d 1328 (Utah 1979). *See also Faries v. Atlas Truck Body Mfg. Co.,* 797 F.2d 619, 624 (8th Cir.1986); *United States v. Tomasian,* 784 F.2d 782, 786 (7th Cir.1986); *United States v. Wright,* 783 F.2d 1091, 1100–01 (D.C.Cir.1986). Even under the rule as it is generally applied, the hearsay statements relied on by experts do not stand as substantive evidence of the truth of the matter asserted. *Faries; Tomasian; Wright.* Yet that is precisely how the hearsay statements were used here.

The record discloses many instances of overt shaping of testimony. The four boys initially repeatedly denied any instance of sexual abuse of the type charged against the defendant. At first, there were only indications of some sexual activity among two of the accusers and a younger boy. It was only after the four accusers had been interviewed several times by Dr. Snow that they finally began to come up with bits and pieces of the story they eventually told. What each initially "remembered," however, was quite different. Nevertheless, under Dr. Snow's tutelage they eventually came around to "remembering" in a similar fashion one of the incidents in which they were all allegedly involved. This "recollection" was bolstered after they met together with their parents, Dr. Snow, and police personnel to go over the stories together. By the time their testimony was videotaped, the accusers' memories were predictably the same.

At least some of the evidence that convicted the defendant was likely produced by psychologically coercive means. It is of

little consequence that no harm was really intended by those using the coercion.[5]

Richard told Dr. Ann Tyler, a prosecution witness, in a taped interview, "I made it up

5. Creating "memory" in a child that is based in the child's imagination rather than fact is not a difficult process, even without using psychologically coercive techniques. A child's memory based on imagination can merge into a "real" memory that may be indistinguishable in the child's mind from a real-life experience. Suggestive interviewing of a child in the emotionally explosive atmosphere of a sex abuse investigation can permanently distort and destroy a memory of the true events and create mental images of a nonreal event that passes for the memory of a real event. That process is not foreign to common experience. Most parents have observed the transformation in a child's mind of the imaginary to the "real." It has been observed that the process of creating or altering memories may be accomplished in a variety of ways and may produce memory as firm as a real memory:

[C]ues used to trigger recall may also contaminate the contents of the memories recalled. Younger children who lack the skills to recall memories will often accept and take advantage of memorization and recall strategies adults suggest to them. At the same time, younger children are more susceptible to suggestion concerning the details of what they recall.

One likely reason for this susceptibility is the child's inability to accurately distinguish among different sources of memories. Not all memories arise from actual experiences, and while an adult might readily recognize that a certain memory must clearly have its source in dream or fantasy, this recognition might not be so easy for a child.

... [T]here is a fairly low risk that children will confuse different events or take an interviewer's words as ones they themselves have spoken. However, there may be a substantial danger that, if an interviewer's words or procedures move the child to imagine some event or some of its details, the child will thereafter accept the fantasy as a memory.

Children are also vulnerable to memory falsification through more commonplace forms of suggestion, such as repeated interviews suggestively covering the same topic. When questioning concerns familiar persons or events that the child had considerable time to observe, or details central to the subject event or person, a child is probably no more vulnerable to suggestion than an adult under the same conditions. However, even an adult will accept misleading suggestions given repeated interviews over a period of time. Research indicates that, to some extent, the younger the child, the greater the suggestibility.

Problems of suggestiveness may arise from the child's perception of the interviewer as well. Children may more readily accept suggestions from someone they see as of a relatively high social status. There is a danger that an interviewer with a preconceived idea of what has happened will unwittingly impose this idea on the child, and suggest the answers the interviewer expects. The presence of a third party, especially a person who has some interest in or bias toward certain answers, may put additional suggestive pressure on the child.

....

... The interviewer will reassure the child that it is alright to "tell," that he will be safe, that he is loved and will still be loved if he "tells." When he does talk about sexual and abusive activity, he is reassured again, perhaps hugged and kissed, to let him know it is alright. If the child has actually been sexually abused and is having a hard time fitting words to memories or is frightened or embarrassed, these procedures may succeed in helping him recall and communicate his memories.

But what if the child has not been abused? Under these circumstances the interview can be an exercise in learning, not recall. Here is this person, the interviewer, who wants something from him. His mother or father wants something from him as well. They want him to say something, to tell them about something. The child is bound to try to figure out what they are after, especially since it is clear that he gets a positive reaction from them when he says certain things. If he can determine what they want him to say, they will be happy and love him. So he listens to their questions and tries to sort it out. Playing with dolls in certain ways also gets a good reaction. The child may even determine that they want him to tell a certain kind of story, and he invents one. They love him for it. At the next interview, it will not take as long for the child to learn.

The adults think that the child has overcome fear and embarrassment to tell them of a traumatic experience. His hesitancy as he tries to figure out what they want, his uncertainty and shyness, are taken as indications that he has been traumatically abused and is having difficulty talking about it. In fact, they have taught him to tell a story about sexual abuse. If he still denies sexual abuse in the interview, this does not disprove the adults' expectations. Instead, it shows the very depth of the trauma. It would be a strong-willed child indeed who could hold out against persistent, suggestive questioning aimed at eliciting statements that certain events took place, especially when the child knows that he will get a hug and good words if he says that they did.

Christiansen, *Testimony of Child Witnesses*, at 709–13 (footnotes omitted).

[i.e., the story about the defendant] because my dad wouldn't believe me." Richard also said, "Barbara Snow didn't tell me what to say but she told me that it [sex abuse] had happened to me," and "his friends said that the abuse happened and his mom and dad said it happened, so it must have happened." Another boy, Randy, who had been induced by Dr. Snow to disclose child abuse by Bullock, later told his father that in fact there was no abuse. He never testified. Another boy, Steve, could not remember any incident until after two sessions with Dr. Snow, despite "extensive" questioning by his parents prior to Dr. Snow's interviews. Bill denied any abuse when questioned by his parents until after he saw Dr. Snow. Tom said that the first person he told about the incident was Dr. Snow and that the more he talked to her the better his memory became.

The record is replete with instances of the use of coercion, threats, pressure, and suggestion by both Dr. Snow and several parents in persuading the boys to adopt the story that convicted the defendant. The following are a few examples of such methods. Dr. Tyler, a *prosecution* expert witness, testified:

Q. Now, in relationship to, ahh, [Richard], did you take into consideration in examining him, his relationship with his father?

A. I looked very carefully at the family dynamics on all of these children.

Q. And in relationship to [Richard's] father, he was expressing to you that he was somewhat distressed by it at that particular period of time, was he not?

A. Mr. Smith expressed that.

Q. And [Richard] also expressed that to you, did he not?

A. Not in those terms.

Q. Didn't he tell you, in relationship to your taped interviews, that he didn't really like talking to his dad?

A. That's correct.

Q. *And that he felt pressured from his father?*

A. *That's correct.*

Q. *And were you aware that during the time period before [Richard] saw*

*you, that his father, for several months, had been discussing and putting pressure on [Richard] every week.... Were you aware of that?*

A. By pressure would you, would you like to talk about that or would you like me to talk about that?

Q. *Well, in relationship to pressure, is it not true that in your report, that you related that during the December 13, ahh, meeting at the County Attorney's Office, that Mr. Smith told [Richard], "You can either be on [the prosecution's] team or you can be on Brett's [i.e., the defendant's] team."*

A. Um-humm (affirmative).

Q. *And would that be the type, would that be considered pressure to a young child?*

A. *Oh, yes, indeed. Probably undue pressure.*

Q. And did you also have in that report that once he had made that statement and at the time that [Richard] denied during that December 13 meeting that anything happened, that Mr. Smith then decided to put additional pressure on [Richard]?

A. I'm not following you there.

Q. In your reports, do you not have the statement that in relationship to the December 13 meeting that, after telling [Richard] that he could either be on Brett's team or on [the prosecution's] team, that he then applied additional pressure to him?

. . . .

A. Which page?

Q. First page. Background information, second paragraph. *[Richard's father] claims that he, ..., put more pressure on [Richard] to report events. For example, you can be on [Bill's] team or Brett's team. And that was in relationship to after [Richard] had denied his involvement and after he had heard that [Bill] and [Steve] gave their accounts of what happened.*

Is that contained in your report?

**170**

A. Yes.

Susan, Bullock's daughter, testified:

Q. Did there come a time in September of 1985 when your mother took you to see Dr. Barbara Snow? Do you remember that?

A. Yes.

Q. You may not remember the day, but do you remember, ahh, you only saw Dr. Snow one time, is that right?

A. Yes.

Q. And your mother took you to the Center where she worked where you were to be seen by her.

A. Yes.

Q. Did you know before you got there why you were going?

A. No.

Q. Did your mother give you any idea or anything, did she tell, what was the reason she gave to you that she was taking you to see Dr. Snow?

A. She didn't give me a reason.

Q. She just said, we are going?

A. Well, she just said that we were going to talk to a counselor.

Q. Okay. And what did you think that would involve?

A. For, ahh, the custody.

Q. For the custody evaluation? And tell us, to the best of your recollection, what, what happened when you went in to talk to Barbara Snow? What she asked you and what the subject was about. Just as best you can recall.

A. She asked me if anybody ever touched me wrong or anything like that. And I told her no.

Q. Is that how she started the interview, or did she tell you why you were there?

A. Umm, yeah, she asked me if I knew why I was there and I told her no. And so then she told me.

Q. What did she say?

A. Ahh—

Q. Why, what did she, what did she say when she told you were there, the best that you can remember?

A. She told me that she was supposed to talk to me about, ahh, if anybody had ever touched me.

Q. Okay. Did she tell you what she meant, if anybody had ever touched you? I mean, did you—go ahead.

A. Ahh, well, I got what she meant, I don't think she—

Q. Okay. You knew she was talking about a sexual touching?

A. Yes.

Q. An inappropriate type of touching, okay. Go ahead, what did she say to you and what did you say to her after that?

A. *Umm, she, well, I asked her if, umm, if she had already, she acted like she already thought that somebody had and so I asked her about that and she said, no. And, ahh, she just kept asking me if somebody had and I told her no. But, you know, she just, it seemed like she was trying to get me to say yes. She just kept bugging me to say it.*

Q. *Okay. Did she tell you some other kids had told her that you had been involved in some sexual touching?*

A. *Yes.*

Q. *And did she, did she keep asking you over and over and over whether or not these kids were telling the truth and you had been involved in some sexual touching?*

A. *Yes.*

Q. And you told her all the time no, you had not been?

A. Yes.

Q. Did there come a time when she told you that, if you didn't admit to what had happened—

MR. NAMBA: Your Honor, these questions are leading, I would request that the Court instruct it differently.

THE COURT: I will sustain the objection.

Q. *Good, did she ever mention at any time, referring to the juvenile authorities?*

A. *Yes, she said that if I kept lying, that then it would just make a bigger problem and she said something*

*about going to Juvenile Court. Umm, and she just said it would be better if I just admitted it now.*

Q. Okay. At any time did she ask you whether or not your father had touched you in a sexual manner?

A. Yes.

Q. What did you say to that request?

A. I said no.

Dr. Monica Christy, a psychologist testifying for the defendant, testified:

Q. *Did you have an indication from your interview with [Jerry, the defendant's son] that he had felt that he had been pressured by Barbara Snow?*

A. *Yes. He, he indicated that to me when he was telling me about the, how he kept saying no and she said, admit it. And as he talked about it with his father, too.*

. . . .

Q. And explain to us what examples you found there as far as commenting on an answer.

A. *Okay. Umm, there's several ways in which this shaping can occur. One is by a, ignoring the child denies or asking them or any undesirable responses asking the question again. The child learns that he has not given the right answer, so he has to try again.*

*And with Barbara's interviews with [Steve, one of the four accusers], she did this a number of times. Ahh, the tape on October 25, '85, for example, [Steve] says he didn't do anything with any other part of the body in response to her question. And she asks him again and [Steve] changes his answers and says, yes, ahh, the penis was on the leg.*

In the interview with [Richard], umm, ahh, now this is, I'm switching here, this isn't the one that Barbara did, *but I think that [Richard, one of the accusers] also had the, the impression that, umm, the right answer was to, to remember and believe that the incident occurred.* I may be con-

fusing here, but this is a series of tapes that Dr. Tyler did with [Richard].

On one of those tapes, I noted when they were talking about their memory scale from 1 to 10 and he said, well, 1 means that it didn't happen and 10 means that it did, which is a little bit different than 1 meaning, I don't remember, and 10 meaning it did. And so I think that [Richard] was also getting the impression from talking with others in the family and, I'm not sure who all that there was, that there was a right answer.

Q. *And that the wrong answer was to deny the allegations?*

A. *Yes.*

Q. *Now, when you talk about commenting on an answer, is that also where an examiner may say, ahh, good boy?*

A. Yes.

Q. Something of that sort?

A. Yes.

Q. Did you find any examples of that in Barbara Snow's techniques?

A. *Barbara Snow did that a number of times in the audio tape of [Richard] where she would say, yes, or that's great and good and so forth. Ahh, reinforcing his coming up with some more information.*

Q. *And did you find that those instances only occurred when he had divulged information concerning sexual abuse?*

A. *Yes.*

Q. *And did she ever give him any answers when he did not divulge information of sexual abuse?*

A. *No.*

Q. Now, additionally you said that, ahh, ahh, part of what you also learned was, ahh, what was the other part besides challenges?

A. The other ways of shaping?

Q. *Yes.*

A. *The responses. I noticed in a number of occasions on here, Barbara Snow's tape with [Steve], she would confront the undesired response with, you must tell the truth or im-*

*plying that he hadn't told the truth when he gave a response.*

*For example, umm, Barbara said, did you or [Jerry] touch [Susan] in any way? [Steve] said no. Barbara says, it's important to tell the truth and [Steve] said, yes, it happened, me and [Jerry] touched [Susan] with our hands. And Barbara said, "And." And he said, just our hands.*

*I think that the implication's that he didn't tell the truth the first time around and that he, ahh, that was not the answer she wanted.*

Q. Now when you use the term shaping, what do you mean by that?

A. *I mean that through a series of interviews, a child can learn what's expected of him and I'm not saying that the, the interviewer comes right out and says that and it may not even be a conscious process on the part of the interviewer, but I think that's why it's important to watch how you ask questions because there may be subtle cues given to the child as to what kind of information will, is expected or what will be rewarded.*

Q. And from what you are saying, Dr. Christy, this did not have to be deliberate on the part of the examiner.

A. Yes, right.

Q. But it can be done through improper interviewing techniques.

A. Yes.

Q. *And, ahh, assuming that Barbara Snow testified that when she does assessments that she does not view herself as being neutral and unbiased, but as a child advocate. Is that an acceptable stance in the, ahh, position of clinical psychologist today?*

A. *No.*

Q. *And why not?*

A. *Because, umm, a child advocate being a therapist is not able to objectively interview a child. And to obtain the needed information in a way that it can be used, say, in Court.*
. . . .

Q. Did you, do you feel that Ann Tyler faced any particular problems in doing the evaluations of the children at the point that she did?

A. Yes, I think she did.

Q. And what were those problems?

A. Umm, I, the, the children had all had a number of interviews with Dr. Snow and, ahh, it's become my understanding since that they were all to get together and talk with the County Attorney as a group and with the parents. I think that there was a lot that had been said regarding what happened before Dr. Tyler had any chance to interview them on tape.

Q. *And why would that be any problem for Dr. Tyler?*

A. *Well, she wouldn't know, ahh, if their information was coming directly from the child or if the child had, umm, was, had adopted some information that they had heard somewhere else or if they had been, any of their answers had been shaped to the extent that they were reporting something that didn't happen.*

Q. *And in regard to that in reviewing Ann Tyler's statements, did you find any indication that the children had, in fact, received information from other sources?*

A. *Yes, there was quite a bit of that.*

Q. *And what were those examples?*

A. *Ahh, [Richard] was probably the most, umm, blatant case of having the information, the information having been contaminated. He said on the tapes, the March 4 tape, that his dad told him that the other kids had been there. That the other kids had talked about Brett Bullock. Ahh, when she asked, Dr. Tyler asked [Richard] who talked to you, he said Dad. He thinks it happened, but I can't remember. Everything that people told me is familiar. Dad said something tells me it happened.*

*Friends told me it happened. [Steve] and [Bill] said it happened in Farmington, ahh, to them and me at his house. I didn't even know about it until my parents told me.*

*He said my dad says, "Come here,"*
*and talk about it. I know when he's*
*going to talk about it.*

*[Bill] and [Steve] said Brett threat-*
*ened to kill my dog, but I don't re-*
*member. They said I was lying.*
*Last time when we went to Farming-*
*ton, didn't feel good that the kids*
*said I was lying.*

*Dr. Tyler says, are you worried*
*about anything and he said, my dad*
*is on their side, I have been trying to*
*think that it happened. That was*
*just one tape, March 4.*

*March 14, ahh, Dr. Tyler asked*
*[Richard] what did you tell Barbara?*
*I did lie because Dad started begging*
*me. Daddy said he knew it hap-*
*pened. Umm, Dr. Tyler said, what*
*did you hear from, from your dad*
*and Barbara and [Richard] said that*
*we were touched. And then he listed*
*the names of the people that were*
*touched. First time Barbara told me*
*some of them and then my dad told*
*me the other names.*

*On the June 6 tape, ahh, where he*
*is now saying that it did happen,*
*ahh, he said, Barbara didn't tell me*
*what to say but she told me what*
*happened to me.*

*Umm, and the October 10 tape,*
*which is the testimony—*

Q. That would be his video tape testi-
mony?

A. *Yes. He said Barbara told me the*
*names [Steve] and [Jerry]. Barbara*
*said Mr. Bullock's name first. And*
*that's [Richard].*

Q. And did you find any other exam-
ples?

A. *Yes, there were, other examples*
*were with [Steve] and [Tom] and*
*[Richard] and [Randy] and [Bill].*

Q. All right. Let's take first with
[Tom].

A. *Okay. On the February 2 tape,*
*ahh, Dr. Tyler said, who was touched*
*and he said [Steve]. I didn't see, but*
*my mom said it happened to [Steve]*
*and [Bill].*

*On the March 3 tape there wasn't*
*anything.*

*On the October 16 tape—*

Q. And that again would be his vid-
eo testimony?

A. Right. *Barbara mentioned Brett's*
*[the defendant's] name in the inter-*
*view and, ahh, Mom said [Steve] and*
*[Bill] [the accusers] had been touched*
*by Brett before I saw Barbara.*

Q. *Okay. I'm going to have you go a*
*little slower, Doctor, while you are*
*doing this.*

A. *Okay.*

Q. *Okay. Now, in relationship to*
*Barbara Snow, did you find any evi-*
*dence of contamination?*

A. *On the February 19 tape, he said,*
*Daddy said we were going to talk*
*about Brett Bullock and talking*
*about Dr. Tyler that day. Daddy*
*said many others were molested. My*
*dad said another person was in with*
*us, but I can't remember anyone.*

*And then on the October 16, the*
*testimony tape, he says, my parents*
*said others had been touched and we*
*are going to see a doctor because oth-*
*ers said I had been touched. And he*
*also said, Barbara said [Steve] and*
*[Richard] had been in to see her and*
*had been touched by Mr. Bullock.*
*She wanted to know if I had been*
*touched.*

Q. *And did, umm, [Bill], in relation-*
*ship to the testimony tape—excuse*
*me, let me take you back to his origi-*
*nal tape in February when he made*
*the response, ahh, that my dad said*
*somebody else is there but I don't*
*know who.*

A. Yes.

Q. Was that, ahh, in response to a ques-
tion as to what other children were
present?

A. I don't have the, umm, I probably
have it here somewhere. I would have
to look it up.

Q. Is that your general recollection?

A. Yes.

Q. And then in relationship to the, ahh,
video testimony that he gave, did he

add any other individuals' names during the video testimony?

A. Again, I would have to look that up in my notes, I don't have it right here.

Q. Now, did you find any other examples of contamination?

A. *Ahh, [Randy's] tape on the 24th, umm, of February. Ahh, he said someone in the ward is sexually abusing kids. I went to an interview and she, meaning Barbara, told me who is doing it and she wanted me to make up a story. Because the pressure was on me, I had to go along with the story. Then told my dad three weeks later that it was not real.*

*Ahh, he's asked, why were your parents concerned? They think someone has scared me but no one has scared me. Dad told me that the police don't think I'm telling the truth, but I am.*

(Emphasis added.)

Prior to Dr. Barbara Snow's involvement in the case, there was no evidence implicating the defendant. Not one accusation against the defendant arose independently of her psychologically coercive interrogations of the boys. Three of the boys had engaged in sexual acts with each other without any adult involvement. Initially, each boy denied to his parents and to Dr. Snow that the defendant was involved, and one boy maintained that position to the very end.[6] Another boy was forced to choose between his allegiance to his father and the truth, as the boy saw it, about the defendant. The boy finally gave in to strong pressure from his father and agreed to tell the accepted story about the defendant. Significantly, both Richard and Randy specifically stated that Dr. Snow first told *them* the tale of sex abuse that later was charged against defendant. They did not originate the story. Richard's father also pressured Richard to tell "Dr. Snow's story." All four boys who accused the defendant had multiple interviews with Dr.

Snow where various forms of pressure were applied.

*All* the other experts who testified, *even the prosecution's own expert,* Dr. Ann Tyler, criticized Dr. Snow's techniques on the ground that they were likely to taint and distort the testimony of the children. Not one expert testified that her techniques and methods were accepted techniques in the fields of psychology or social work. Dr. Monica Christy and Dr. Stephen Golding testified that Dr. Snow's methods were coercive and suggestive and were likely to elicit a desired response from the children. They also criticized the absence of adequate record keeping and videotaping procedures to record both the questions and the answers in the interviews with the boys. Even Dr. Tyler, a prosecution witness, criticized Dr. Snow's techniques for their lack of objectivity and their likelihood of eliciting distorted and erroneous answers.

Indeed, Dr. Snow herself admitted that she used interrogation procedures that were not intended to sift truth from error. She forthrightly admitted she was not a neutral interviewer; rather, she was "an ally for the child," "biased," and "not a fact collector like the police." She also testified that it is not her practice to videotape her sessions with children, even though that is the only possible way to evaluate her methods and the reliability of her interrogations. She also testified in effect that there was nothing in her methods that served as a standard for determining the truthfulness of the stories she produced by her interrogation. She admitted as much in answering the following question:

Q. So my question is, how does someone judge your judgment and review your version of what a child has told you?

A. Only on my report of what occurred.

Thus, the sole basis for judging the reliability of the methods Dr. Snow uses, ac-

---

**6.** Children who have been abused may recant their stories. However, the evidence in this case in each instance gives rise to the inference that the denials and recantations reflected the truth. The recantations were certainly not prompted by any motive on the part of any boy to try to prevent a family member from going to prison, as is often the case with recantations.

cording to her own testimony, is her "own integrity is all you would have." But since she starts an interrogation with the assumption that abuse has occurred, she then proceeds to prove that point. Never before to my knowledge has a court of law allowed an "expert" to testify to such a self-fulfilling prophecy in the guise of an expert opinion. Thus, whatever expertise Dr. Snow demonstrated has to do with obtaining evidence from children to prove an assumption and not to elicit truthful responses.

This whole shocking perversion of juridical truth-seeking procedures flies in the teeth of the rule that scientific evidence should be based on foundational evidence showing some reasonable degree of reliability as the predicate for the admission of expert conclusions. *Kofford v. Flora*, 744 P.2d 1343, 1346–48 (Utah 1987); *Phillips v. Jackson*, 615 P.2d 1228, 1234–35 (Utah 1980). There was no such foundation here. Beyond the absence of foundation evidence, the so-called scientific evidence adduced by Dr. Snow's conclusions that the boys were abused and were telling the truth in the stories they finally adopted was expressly disallowed in *State v. Rimmasch*, 775 P.2d 388, 393–407 (Utah 1989).[7]

In short, any claim that scientific principles or Dr. Snow's own expertise and experience validate her conclusions and procedures is devastatingly refuted by her own statement, "I didn't believe any of those kids when they told me it didn't happen." On that ultimate point, she was demonstrably wrong—the jury so found on several counts. Curiously, Dr. Snow did not bother to explain why she so unhesitatingly assumed that the children lied only when they denied sexual abuse. There was no physical evidence of abuse, nor was there any other objective evidence of abuse.

The following testimony illustrates her attitude and approach toward interviewing or interrogating a child:

Q. When you went into that interview with [Susan], umm, you believed in your mind that she had been sexually abused, did you not?

A. Yes, I did.

Q. *And that was based solely on the statement of [Steve]?*

A. That is correct.

. . . .

Q. But she denied it to you and you just basically told her you had better go talk to somebody else because I don't believe you.

A. It wasn't that I told her that I don't believe her, she got very upset and she felt like she couldn't work with me there. I didn't tell her that she couldn't work with somebody else because I didn't believe her. *I didn't believe any of these kids when they told me it didn't happen.* But [Susan] got upset and I felt didn't have much rapport with me. Didn't have much confidence.

. . . .

Q. She did continue counseling with ISAT, did she not?

A. She did.

Q. And all through those counseling sessions which were numerous, she was never, she's always denied molesting anybody or being molested by her father, didn't she?

A. That's my recollection.

(Emphasis added.)

All the prosecution hearsay evidence, i.e., the entire core of its case, was inadmissible under § 76–5–411, the child hearsay exception in child sex abuse cases. To qualify under that section, the hearsay must be shown to be reliable. While the trial court made findings under § 76–5–411, it did not

7. *Kofford v. Flora*, 744 P.2d 1343, 1346 (Utah 1987), stated that "new scientific evidence may be found reliable either under the general scientific acceptance test enumerated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), or under a broader test of reasonable demonstrability of reliability or 'inherent reliability.'" (Quoting *Phillips v. Jackson*, 615 P.2d 1228, 1234–35 (Utah 1980).) What is clear from *Phillips, Kofford,* and *Rimmasch* is that trial courts must critically examine so-called scientific evidence to ensure that its roots are indeed firmly grounded in science before such evidence is admitted. Such a critical examination was not conducted by the trial court in this case.

address the issues of reliability which are raised by undisputed evidence of coercion, suggestion, intimidation, confabulation, and falsehood. Nor did the court take into account relevant aspects of developmental psychology. As a matter of law, the findings are utterly inadequate on the facts of this case. Just as in *Lenaburg*, the victims' statements related through Barbara Snow and other experts were simply so unreliable that they should not have been admissible.

In sum, the tainting, indeed the inducing of testimony in this case, was not benign— it was the product of a misdirected zealousness and the failure to adhere to any scientific standards for the eliciting of truthful testimony. By itself, that should require a reversal. Furthermore, this outright assault on the truth was aggravated by the defendant's inability to cross-examine at all as to the boys' statements made to Drs. Snow and Tyler and the limited cross-examination of the four boys when the video-tapes of their testimony were made. Clearly, there was no valid constitutional reason why the four boys could not have testified at trial, as has happened in any number of similar cases that have reached this Court. Had they testified, their testimony might have dissolved some of the taint.

## III.  CONFRONTATION

### A.  *Denial of Face–To–Face Confrontation with the Accused Was Unconstitutional.*

The four boys did not testify at trial and were not called to testify. It was the obligation of the prosecution to call them to testify. The defendant was tried and convicted without ever being confronted by his four young accusers.

The testimony of the four nine-year-old witnesses, Richard, Bill, Tom, and Steve, was videotaped pursuant to Utah Code Ann. § 77–35–15.5(3) (Supp.1988) and played on a television monitor for the jury.[8]

---

**8.** Utah Code Ann. § 77–35–15.5(2)–(4) (Supp. 1989) provides:

(2) In any case concerning a charge of child abuse or of a sexual offense against a child, the court may order, upon motion of the prosecution and for good cause shown, that the testimony of any witness or victim younger than 14 years of age be taken in a room other than the court room, and be televised by closed circuit equipment to be viewed by the jury in the court room. All of the following conditions shall be observed:

(a) Only the presiding judge, attorneys for each party, persons necessary to operate equipment, and a counselor or therapist whose presence contributes to the welfare and emotional well-being of the child may be with the child during his testimony. The defendant may also be present during the child's testimony unless he consents to be hidden from the child's view, or the court determines that the child will suffer serious emotional or mental strain if he is required to testify in the defendant's presence, or that the child's testimony will be inherently unreliable if he is required to testify in the defendant's presence. If the court makes that determination, or if the defendant consents:

(i) the defendant may not be present during the child's testimony;

(ii) the court shall ensure that the child cannot hear or see the defendant;

(iii) the court shall advise the child prior to his testimony that the defendant is present at the trial and may listen to the child's testimony;

(iv) the defendant shall be permitted to observe and hear the child's testimony, and the court shall ensure that the defendant has a means of two-way telephonic communication with his attorney during the child's testimony; and

(v) the conditions of a normal court proceeding shall be approximated as nearly as possible.

(b) Only the presiding judge and attorneys may question the child.

(c) As much as possible, persons operating the equipment shall be confined to an adjacent room or behind a screen or mirror so the child cannot see or hear them.

(d) If the defendant is present with the child during the child's testimony, the court may order that persons operating the closed circuit equipment film both the child and the defendant during the child's testimony, so that the jury may view both the child and the defendant, if that may be arranged without violation of other requirements of Subsection (2).

(3) In any case concerning a charge of child abuse or of a sexual offense against a child, the court may order, upon motion of the prosecution and for good cause shown, that the testimony of any witness or victim younger than 14 years of age be taken outside the courtroom and be recorded. That testimony is admissible as evidence, for viewing in any court proceeding regarding the charges if the provisions of subsection (2) are observed, in addition to the following provisions:

Videotapes of the boys testifying were made some *two months* before trial. *Over the defendant's express objection,* he was denied the right to confront the boys even at the videotaping session. Instead, he was placed in a separate room to watch the interrogation of the boys on a television monitor. Virtually the entire prosecution case consisted of the videotapes of the four boys and the prosecution's two "experts," whose testimony was based almost exclusively on the out-of-court hearsay statements the boys made to the experts.

Defendant twice objected to his exclusion from the interrogation of the four boys on the ground that his exclusion violated his "right to confront witnesses under both the Utah and United States Constitutions," after his pretrial motion to "be allowed to be present during the recording of the children's testimony" was denied. After raising the issue during pretrial proceedings, he had no obligation to again raise the issue in the trial court since the same judge presided at both stages. We have squarely held that a further objection at trial is not necessary to raise an issue on appeal under such circumstances. *State v. Johnson,* 748 P.2d 1069, 1071–72 (Utah 1987). On appeal, Bullock has also argued the denial of confrontation. While that contention does not squarely focus on the denial of face-to-face confrontation, the two issues are so intimately related as to require the conclusion that the issue has been raised on appeal. In all events, it is perfectly clear beyond all doubt that there was no "conscious trial strategy" to forego making the objections at trial, as the majority contends.

Article I, section 12 of the Utah Constitution and the Sixth Amendment to the United States Constitution give to those accused of crime the right to confront their accusers face to face. The importance of confrontation as a basic attribute of fairness in dealing with accusations against persons was recognized long before it evolved as a procedural right under the common law of England. One ancient reference to that right as a basic attribute of fairness is even found in the New Testament. In referring to the Apostle Paul, who had been arrested, Festus, in addressing King Agrippa, stated:

> It is not the manner of the Romans to deliver any man to die, before that he which is accused have the accusers face to face, and have license to answer for himself concerning the crime laid against him.

*Acts* 25:16.

Face-to-face confrontation is far from a frivolous nicety. Accusers who must directly face an accused when making accusations that can result in a deprivation of liberty or life must face the human reality of the consequences of error or uncertainty in their testimony. The purging effect of the accuser confronting an accused is widely recognized even outside of courtrooms. The policy of the rule is of special importance in this case, where great pressure was applied to youthful accusers who were particularly susceptible to adult influences.

*State v. Mannion,* 19 Utah 505, 57 P. 542 (1899), requires face-to-face confrontation in this state under Article I, section 12 of the Declaration of Rights and the Sixth Amendment. In *Mannion,* the defendant was convicted of assault with intent to commit rape on a six-year-old girl. After being summoned to the stand, the girl stated that she was afraid to testify because she was afraid of the defendant. The trial court ordered the defendant to move out of the child's presence and to sit some 24 feet away, out of the sight and hearing of the prosecuting witness and the jury. On ap-

    (a) the recording is both visual and aural and recorded on film or videotape or by other electronic means;

    (b) the recording equipment is capable of making an accurate recording, the operator is competent, and the recording is accurate and is not altered;

    (c) each voice on the recording is identified; and

    (d) each party is given an opportunity to view the recording before it is shown in the courtroom.

    (4) If the court orders that the testimony of a child be taken under Subsection (2) or (3), the child may not be required to testify in court at any proceeding where the recorded testimony is used.

peal, this Court reversed, holding that the procedure violated the defendant's state constitutional right to a face-to-face confrontation. The Court stated:

"We take it that the word 'confront' does not simply secure to the accused the privilege of examining witnesses in his behalf, but is in affirmance of the rule of the common law, that in trial by jury *the witnesses must be present before the jury and accused, so that he may be confronted, that is, put face to face.*"

. . . .

*. . . He had the right not only to examine the witnesses, but to see into the face of each witness while testifying against him, and to hear the testimony given upon the stand. He had the right to see and be seen, hear and be heard, under such reasonable regulations as the law established. . . .*

. . . .

In cases of this character, where the witness is young, the court should have considerable latitude in protecting the witness from the effects of improper conduct and language of parties and of counsel, but in doing so the constitutional right of the defendant must be protected. The defendant was entitled to a trial in accordance with law. *He was entitled to be confronted by witnesses of the State face to face, and he can not be denied a constitutional right because of the youth, incapacity, or unwillingness of the witness brought against him to meet him face to face.*

19 Utah at 512–13, 57 P. at 543–44 (emphasis added, citations omitted).

*Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), decided under federal confrontation law, is to the same effect as *Mannion.* In *Coy,* the Court held that a defendant's right of confrontation under the Sixth Amendment was violated when a screen was erected between the complaining witnesses and the defendant at trial. The screen prevented the defendant and the witnesses from seeing each other directly, although the defendant could hear the witnesses and see them dimly. The jury was able to observe the demeanor of both the defendant and the witnesses. On appeal, the Supreme Court held that the right of confrontation means a right to personal, face-to-face confrontation. The Court declared:

The perception that confrontation is essential to fairness has persisted over the centuries because there is much truth to it. A witness "may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts. He can now understand what sort of human being that man is." Z. Chafee, The Blessings of Liberty 35 (1956), quoted in *Jay v. Boyd,* 351 U.S. 345, 375–376, 76 S.Ct. 919, 935–36, 100 L.Ed. 1242 (1956) (Douglas, J., dissenting). It is always more difficult to tell a lie about a person "to his face" than "behind his back." In the former context, even if the lie is told, it will often be told less convincingly. . . . The State can hardly gainsay the profound effect upon a witness of standing in the presence of the person the witness accuses, since that is the very phenomenon it relies upon to establish the potential "trauma" that allegedly justified the extraordinary procedure in the present case. That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; *but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult.* It is a truism that constitutional protections have costs.

108 S.Ct. at 2802. The Court concluded in *Coy* that it is "difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter." *Id.* That point is equally true in the instant case.

The rule requiring face-to-face confrontation has also been recognized in a number of other cases. *E.g., Pennsylvania v. Ritchie,* 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987); *Dowdell v. United States,* 221 U.S. 325, 330, 31 S.Ct. 590, 592, 55 L.Ed. 753 (1911); *Commonwealth v. Bergstrom,* 402 Mass. 534, 524 N.E.2d 366 (1988). The right of face-to-face confrontation has been applied in recent cases to

hold procedures such as were used here unconstitutional. *State v. Warford,* 223 Neb. 368, 375–77, 389 N.W.2d 575, 581 (1986) (presentation of child accuser's closed-circuit testimony with no face-to-face confrontation violated state and federal constitutional provisions where no "compelling need" to protect child witness was shown).

Even if exigent circumstances of some type might allow a child to testify without having to confront the accused, *see Coy v. Iowa,* 108 S.Ct. at 2805 (O'Connor, J., concurring), evidence justifying such an exception must be compelling. *State v. Jarzbek,* 204 Conn. 683, 708, 529 A.2d 1245, 1257 (1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1017, 98 L.Ed.2d 982 (1988); *State v. Warford.* Under *Mannion,* a child's fear of the defendant is not a sufficient reason to dispense with face-to-face confrontation, and under *Coy,* simple trauma that a child experiences when testifying against an alleged abuser is not sufficient. Thus, Utah Code Ann. § 77–35–15.5(2)(a), which provides that a trial court may dispense with face-to-face confrontation if "the child will suffer serious emotional or mental strain if he is required to testify in the defendant's presence," requires more than simple fear, trauma, stress, or upset. "Emotional or mental strain" is experienced by virtually all witnesses, both adults and children, and is not by itself a constitutionally acceptable excuse for dispensing with face-to-face confrontation when a child testifies. Indeed, in *State v. Webb,* 779 P.2d 1108 (1989), Justice Zimmerman wrote in a separate opinion:

> Our reading of ... United States Supreme Court cases leads us to conclude that in order for a witness to be constitutionally unavailable, it must be practically impossible to produce the witness in court. It is not enough to show that the witness would be uncomfortable on the stand or that testifying would be stressful.

779 P.2d at 1112–13.

The trial court's findings that the four boys would suffer serious emotional or mental strain if required to testify in the presence of the defendant are simply insufficient as a matter of law under the requirements of Article I, section 12 and the Sixth Amendment.[9] The trial court found that the four boys were between nine and ten years old at the time they testified, that they were mentally "developed," and that the defendant's presence would cause "serious stress" to them if he were allowed to be present when they testified.[10] The trial

---

**9.** Justice O'Connor, in her concurring opinion in *Coy,* stated that protecting child witnesses is an "important public policy" which may overcome the high scrutiny applied to confrontation clause challenges when case-specific findings of necessity have been entered. *Coy v. Iowa,* 108 S.Ct. 2798, 2805 (1988) (O'Connor, J., concurring). *See also State v. Jarzbek,* 204 Conn. 683, 708, 529 A.2d 1245, 1257 (1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1017, 98 L.Ed.2d 982 (1988) (videotaping procedure outside of presence of defendant is permissible if there is clear and convincing evidence of a compelling need).

**10.** The trial court entered the following findings, based almost exclusively on the testimony of Dr. Ann Tyler, one of the prosecution's expert witnesses at trial, regarding the mental and emotional condition of each of the four boys:

> The COURT WOULD FIND relative to [Bill], and generally as to all of these young men, that they all are between the ages of 9 and 10 years of age. That they are all developed mentally, still children and still in the process of establishing an identity and self-respect and those attributes which are critical to the proper development of a young person.

> In addition in regards to the child [Bill], the COURT FINDS that, as Dr. Tyler has testified, he appears to be somewhat withdrawn, ahh, he expresses fear as a result of the incident alleged in this matter and of the alleged relationship with the defendant, Mr. Bullock. That under the circumstances, as the evidence and the factors which have been brought to the Court's attention, the COURT WOULD FIND that for Mr. Bullock to be present while [Bill] testifies would cause the child to suffer severe emotional or mental strain and, therefore, will require that the defendant not be present during that testimony.

> As to [Richard], the COURT FINDS that he also, as the Court has previously found, is basically still a child. That he is emotionally very active and that the alleged relationship with the defendant was a very traumatic experience to him and that he, as a result of that experience, has a, experienced some physical symptoms such as hyperventilation and becoming very upset in discussing this matter and talking about it, and for that reason, the Court, in addition to the other basis provided by Dr. Tyler in which the Court accepts, will

court also found that Bill "expresses fear as a result of the incident alleged in this matter and of the alleged relationship with the defendant...." As stated, that finding, with nothing more, is inadequate as a matter of law under *Mannion*. The trial court also found that Richard was experiencing some "hyperventilation and becoming very upset in discussing this matter and talking about it...." However, his hyperventilation is a condition that existed since kindergarten, long before any of the acts alleged in the information. That, too, is inadequate.

To be adequate, the findings must be based on evidence showing a probability of substantial, long-term psychological harm that will result from a face-to-face encounter with the defendant at trial. Here, there were no particularized findings of identifiable harm that might result if the boys were to testify. Even though a child experiences anxiety and stress, testifying may actually have some beneficial aspects. In *State v. Jarzbek*, the court noted:

> [I]t is by no means clear that sexually abused children are harmed, psychologically or otherwise, by the experience of testifying in the presence of their alleged abusers.
>
> ....
>
> In order to satisfy its burden of proving compelling need, the state must show that the minor victim would be so intimidated, or otherwise inhibited, by the physical presence of the defendant that the trustworthiness of the victim's testimony would be seriously called into question. Furthermore, the state bears the

burden of proving such compelling need by clear and convincing evidence.

204 Conn. at 702–05, 529 A.2d at 1254–55. *See also State v. Warford*, 223 Neb. at 376–77, 389 N.W.2d at 581 (absent a compelling need to protect the child witness based on a "particularized showing" of further trauma, the use of closed circuit television held unconstitutional). *Cf. McGuire v. State*, 288 Ark. 388, 393–94, 706 S.W.2d 360, 362–63 (1986) (statute required face-to-face confrontation of victim and defendant at time of video deposition). *But see State v. Twist*, 528 A.2d 1250, 1256 (Me.1987).

B. *Not Requiring the Four Accusers To Appear and Testify at Trial Before the Jury Was Unconstitutional.*

The right of confrontation under both the Sixth Amendment and Article I, section 12 insures not only that a defendant can confront his accusers face to face, but also that the jury can see and hear the witnesses in person to assess their credibility. This Court, in *State v. Anderson*, 612 P.2d 778 (Utah 1980), articulated the scope of the right in the following language:

> Classically, the primary object of the constitutional right of confrontation is to prevent depositions and ex parte affidavits from being used against the accused at trial in lieu of a personal examination and cross-examination of the witness against him. When confrontation is available the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face-to-face

also FIND that it would be a situation that would seriously damage [Richard] emotionally and mentally if he were required to testify in the presence of the defendant.

As to [Steve], the Court's [sic] make a similar finding. Developmentally, he is still a child under the age of 10 years. That he also has expressed fear and anxiety as a result of this and appears to be withdrawn socially. And evidences symptoms of depression as a result of this experience.

Based upon those findings, the COURT WOULD FIND that the child will have serious stress or emotional strain if required to testify in the presence of the defendant.

As to [Tom], the Court makes similar finding[s] as to the age and developmental pro-

cesses. He appears to be 10 years of age now, but still fits within that category. He has also expressed anxiety and shown symptoms of fear and, ahh, to the extent of, in his own mind for his own protection, fantasizing the fact that the defendant has been and is incarcerated, which, in fact, he has been instructed and knows that he is not incarcerated.

Based upon the testimony of Dr. Tyler and the observations of the Court, the Court would also FIND that to require the child to testify in the presence of the defendant would require or cause serious emotional or mental strain on the child.

And for that reason, the Court will Order that Mr. Bullock be allowed to participate outside the interview room.

with the jury in order that they may look at him and judge by his demeanor and the manner in which he gives his testimony whether he is worthy of belief. Encompassed in this right of confrontation is the procedural right of cross-examination and the recognition of certain procedural rights regarding the exclusion of extra judicial statements, similar to those found protected by evidentiary rules excluding hearsay evidence.

612 P.2d at 785 (footnotes omitted). The United States Supreme Court has defined the scope of the right in a nearly identical manner. *See California v. Green,* 399 U.S. 149, 157–58, 90 S.Ct. 1930, 1934–35, 26 L.Ed.2d 489 (1970); *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895).

As a practical matter, not all testimonial evidence can be given by the declarant in court. Out-of-court statements which do not meet a hearsay rule exception may still be admissible if they are shown to be reliable and the declarant is unavailable. *See Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *State v. Chapman,* 655 P.2d 1119 (Utah 1982). Nevertheless, every reasonable effort must be made to put the declarant on the stand when the declarant is available. *See Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *State v. Webb,* 779 P.2d at 1113 (opinion of Zimmerman, J.). In *Commonwealth v. Bergstrom,* 402 Mass. 534, 536, 524 N.E.2d 366, 376 (1988), the court noted in language relevant here:

Absent compelling circumstances, a jury ought to be able to view the interaction between a witness and others who are present. The subtle nuances of eye contact, expressions, and gestures between a witness and others in the room are for the jury to evaluate. Hearing the disembodied, off-screen voices of the judge and the attorneys is not ordinarily an adequate substitute for witnessing personal interactions.

Courts in other jurisdictions have held on stronger factual showings than were made here that the presentation of testimony by child victim witnesses via videotapes or closed-circuit television of their testimony could not be constitutionally used in lieu of live testimony at trial, absent a very compelling showing of need. *See, e.g., State v. Jarzbek; State v. Warford; see also United States v. Benfield,* 593 F.2d 815 (8th Cir.1979); *Hochheiser v. Superior Court (People),* 161 Cal.App.3d 777, 208 Cal.Rptr. 273 (1984); *Commonwealth v. Bergstrom.*

Even mental illness may not be enough to establish unavailability for constitutional purposes. In *Burns v. Clusen,* 798 F.2d 931, 938 (7th Cir.1986), the court declared that unexplained trauma is not sufficient to establish unavailability:

As to severity, mental illness itself may not automatically render a witness unavailable. The judge must consider the symptoms, what tasks a witness is then capable of. While all victims of violent crimes may suffer emotional trauma, some victims may suffer far greater anguish than normally accompanies court appearances. *See, e.g., Warren v. United States,* 436 A.2d 821, 828–29 (D.C.App.1981) (two psychiatrists independently conclude that if a rape victim were forced to testify, the probability of severely incapacitating psychological injury was high because her depression had reached suicidal levels).

*See also People v. Stritzinger,* 34 Cal.3d 505, 516, 668 P.2d 738, 746, 194 Cal.Rptr. 431, 439 (1983); *People v. Johnson,* 118 Ill.2d 501, 508, 115 Ill.Dec. 384, 387–88, 517 N.E.2d 1070, 1073–74 (1987) (child witnesses who were very frightened were not unavailable to testify at trial); *State v. Sanchez,* 752 S.W.2d 319, 322–23 (Mo.1988); *State v. Gollon,* 115 Wis.2d 592, 600–01, 340 N.W.2d 912, 916 (Ct.App.1983) (mother's testimony that child victim was too afraid to testify did not show unavailability).

As shown above, the trial court's findings fall far short of justifying the rulings that the defendant's four accusers did not have to testify in court. Indeed, it is worthy of some note that two of the boys' mothers were initially highly insistent that

their sons be allowed to appear at trial and testify. In truth, it is hard to conceive of a case where it would be more important for the accusers to testify at trial. The defense was that the boys had, in effect, been brainwashed by Dr. Barbara Snow and led by her into confabulating at least part of the stories they told. There is, in fact, evidence that supports that proposition, but defense counsel was never able to really fully explore that critical point because there was no opportunity to cross-examine the four boys in light of the trial testimony of the other trial witnesses.

*State v. Lenaburg,* 781 P.2d 432 (September 28, 1989), presented a similar situation in which a victim's highly unreliable statements were presented via videotape and were not subject to cross-examination. There we stated:

> The tape was the most damning evidence presented at trial. Since defendant could not cross-examine the child concerning her statements made therein, he had no means to explore the contradictory or confusing portions of her testimony. Without this opportunity, we cannot judge what cross-examination would have revealed or the light it would have cast on the remainder of the testimony.

781 P.2d at 437.

The videotapes of the boys were taken two months prior to trial and before defense counsel were fully apprised of the role that Dr. Barbara Snow and others had in shaping and creating testimony against the defendant. Cross-examination of the boys during the videotaped testimony did not even begin to explore that subject adequately. By the time of trial, defense counsel were aware of several recantations by several boys and of allegations of psychological coercion and intimidations practiced by Dr. Snow and others. But the *key* figures, the nine-year-old boys, were safely insulated from further examination, and so the issue was never properly explored.

In sum, I submit that the facts concerning coercion, suggestion, intimidation, confabulation, and shaped testimony raise overwhelming doubt as to the reliability of the accusers' allegations of sexual misconduct as presented through the testimony of the prosecution's "experts" and the accusers themselves on videotape. The trial judge's findings on reliability are totally inadequate under § 76-5-411. A correct assessment of the reliability issue leads to the conclusion that the statements were highly unreliable and should have been excluded. Furthermore, the accusers were not "unavailable" as this Court, the United States Supreme Court, and others have interpreted that term, and thus the defendant's right to face-to-face confrontation was unconstitutionally denied. For that reason alone, the accusers' videotaped statements should not have been admitted. Indeed, if confrontation had been allowed, the truth and value of the evidence could have been tested by the juridical means designed for that purpose. At the very least, proper confrontation at the time of trial would have clarified the contradictory and confusing portions of the accusers' various stories. The problems presented by this case raise the most critical issues of evidentiary reliability and demand application of the manifest error doctrine. If that doctrine does not apply here, I am at a loss to identify where it may have application. In all events, the issue of face-to-face confrontation was in fact raised and clearly ought to be addressed by the majority.

HOWE, Associate Chief Justice, concurs in parts I and II and in the result of part III of the dissenting opinion of STEWART, J.

DURHAM, J., having disqualified herself, does not participate herein; BILLINGS, Court of Appeals Judge, sat.